**ITG, INC. and Roy Goldberg**

v.

**PRICE WATERHOUSE.**

**Civ. A. No. 86–6332.**

United States District Court, E.D. Pennsylvania.

Sept. 7, 1988.

---

Neil G. Epstein, Leslie A. Hayes, Carol L. Press, Philadelphia, Pa., for plaintiffs.

John G. Harkins, Jr., Patricia L. Freeland, Philadelphia, Pa., Rodman W. Benedict, New York City, Jon A. Baughman, Eleanor N. Ewing, Caroline H. West, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

This action is the latest, and hopefully the last filed, in a series of actions arising from the demise of AIA Industries, Inc. *See e.g., Gruber v. Price Waterhouse,* No. 86–3976 (E.D.Pa.); *Begier v. Price Waterhouse,* No. 86–6096 (E.D.Pa.); *K.B. Equities, Inc. v. Price Waterhouse,* No. 86–4295 (E.D.Pa.); *In re AIA Industries, Inc. Securities Litigation,* Master File No. 84–2276 (E.D.Pa.). Here, the plaintiffs are ITG, Inc. and its president and sole shareholder, Roy Goldberg, both of whom were substantial customers and major investors in AIA. For a short period of time, Roy Goldberg also sat on the AIA board of directors. They brought this action against Price Waterhouse for its role in the preparation of AIA financial statements for 1982 and 1983 and for the issuance of unqualified opinions as to the accuracy of these statements. They principally allege that transactions between AIA and ITG were erroneously recorded thus overstating the revenues of AIA. Defendant now moves for summary judgment on the ground that plaintiffs' claims are barred by the statute of limitations.

Plaintiffs claims arise from their purchases of AIA common stock in 1982, 1983, and 1984[1] and are brought pursuant to section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b) and rule 10b–5, common law fraud and deceit, and common law negligence. Before examining the facts of record, it is necessary to determine the appropriate limitations period for the claims. For the reasons that follow, I conclude that all the claims are governed by a two-year statute of limitations.

## I. Governing Legal Standards

### A. *Applicable Statutes of Limitations*

The parties agree that plaintiffs' common law fraud claims arising from their 1984 purchases, as well as the negligence claims, are governed by a two-year statute of limi-

---

1. ITG also made substantial loans to AIA during this period, portions of which were converted into equity.

tations measured from the date plaintiff knew or should have known by the exercise of reasonable diligence of the existence of their injury and its cause. *See* 42 Pa.Cons. Stat. Ann. 5524(2), (7); *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268 (3d Cir.1987). The parties disagree as to the applicable limitations period for the common law fraud claims arising from the 1982 and 1983 purchases and their section 10(b) and rule 10b–5 claims.

In an *en banc* decision, the Third Circuit recently held that the limitations period governing various claims brought under the Securities Act of 1933 also governs the implied causes of action under section 10(b) and rule 10b–5; thus, such claims are barred if plaintiffs knew or should have known of them in the exercise of reasonable diligence more than one year before suit was filed or within three years after the securities were purchased, whichever is earlier. *In re Data Access Systems Securities Litigation*, 843 F.2d 1537, 1550 (3d Cir.1988). In *Gruber v. Price Waterhouse*, No. 86–3976 (E.D.Pa. August 26, 1988), I held that *Data Access* did not apply retroactively to the circumstances of that case. My analysis in *Gruber* is equally applicable here; therefore, I will apply the common law statute of limitations for fraud to plaintiffs' federal securities claims. Appended to this opinion is a copy of my decision in *Gruber* and the portion dealing with the retroactivity of *Data Access* is incorporated by reference.

B. *Accrual of the Statutes of Limitations*

■ For purposes of their federal securities and common law fraud and deceit claims arising from the 1982 and 1983 statements, plaintiffs have moved to strike the statute of limitations defense on the ground that a six-year statute governs be-cause these claims accrued before February 18, 1983 [2] and therefore, the complaint filed in 1986 [3] was timely. It is clear, however, that federal law governs commencement of the limitations period for the section 10(b) and rule 10b–5 claims and under federal law plaintiffs' claims did not accrue until they knew or should have known of the basis for their claims. *See e.g., Jensen v. Snellings*, 841 F.2d 600 (5th Cir.1988); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123 (1st Cir.1987); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406 (9th Cir. 1987). Here, there has been no allegation that plaintiffs could have known of defendant's alleged misconduct by February 18, 1983; [4] therefore, all the federal claims are governed by a two-year limitations period.

■ The result is the same for the common law fraud and deceit claim. Under Pennsylvania law, a statute of limitations does not being to run until the cause of action accrues. An action accrues when a party has a legal right to institute suit and can maintain a successful action. *E.g., Kapil v. Association of Pennsylvania State College and University Facilities*, 504 Pa. 92, 470 A.2d 482 (1983); *Bell v. Brady*, 346 Pa. 666, 31 A.2d 547 (1943). Before an action may be successfully maintained, a plaintiff must be aware of the injury and what caused it. *See Ayers v. Morgan*, 397 Pa. 282, 290, 154 A.2d 788 (1959); *see also Ross v. Johns–Manville Corp.*, 766 F.2d 823, 827 (3d Cir.1985) (cause of action arising from asbestos exposure accrued "when the decedent first discovered his initial asbestos-related injury."). Since plaintiffs could not have seen any audits performed by Price Waterhouse and thus have been injured or aware of any harm caused by the alleged improper audits until after February, 1983, they could not have maintained a successful action until after this

---

**2.** Effective that date, the Pennsylvania statute of limitations for fraud was reduced from six to two years. *See* 42 Pa.Cons.Stat. Ann. § 5527(6) (Purdon 1981); *A.J. Cunningham Packing Corp. v. Congress Financial Corp.*, 792 F.2d 330, 332–33 (3d Cir.1986).

**3.** The parties agree that under common law, the federal and state claims arising from the 1984 transaction are governed by a two year statute of limitations.

**4.** Price Waterhouse completed the first audit after the beginning of 1983 and did not issue its unqualified report until March 1, 1983. Moreover, plaintiffs allege that they could not have discovered the wrongful conduct by Price Waterhouse until 1986.

date. I will, therefore, apply the two-year statute of limitations for fraud to their common law claims arising from the 1982 and 1983 purchases.

## II. Running of the Statute of Limitations Prior to October 29, 1984

█ Once a statute of limitations defense is pleaded, plaintiffs bear the burden of showing that their complaint was timely filed. *See e.g., Cook v. Avien, Inc.,* 573 F.2d 685, 695 (1st Cir.1978). Defendant, in moving for summary judgment, bears the burden of showing that their are no genuine questions of material fact. *Sorba v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200 (3d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). Because I find defendant has satisfied its burden, I will enter summary judgment in its favor.

While state law provides the statute of limitations for the section 10(b) and rule 10b–5 claims since *Data Access* does not apply retroactively, federal law determines when the limitations period on these actions begins to run.[5] This period runs from the date plaintiffs discovered or in the exercise of reasonable diligence should have discovered the basis for their claims against Price Waterhouse. *See e.g., Hobson v. Wilson,* 737 F.2d 1, 34 n. 103 (D.C. Cir.1984) (collecting cases), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Tobacco and Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 329 (D.Del.1956), *aff'd,* 244 F.2d 902 (3d Cir.1957). Defendant argues that, under this standard, the limitation period ran before this action was filed.

Whether plaintiffs should have known of their claims in the exercise of reasonable diligence requires consideration of several elements. First, plaintiffs must have sufficient information of possible wrongdoing to place a reasonable investor in their position on "inquiry notice" or to excite "storm warnings" of culpable activity.[6] Whether an investor is under a duty of reasonable diligence depends upon the particular circumstances, "including (the) existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings." *Tobacco and Allied Stocks,* 143 F.Supp. at 331. *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987). Once on inquiry notice, plaintiffs have a duty to exercise reasonable diligence to uncover the basis for their claims and are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period. *See e.g. Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873 (9th Cir.) *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984); *Robertson v. Seidman & Seidman,* 609 F.2d 583 (2d Cir.1979); *Cook v. Avien, Inc.,* 573 F.2d 685 (5th Cir.1978). Whether plaintiffs should have discovered the defendant's culpable actions involves both an objective and subjective analysis of what should have been discovered by plaintiffs in the exercise of reasonable diligence. *See, e.g., Maggio,* 824 F.2d at 128; *Tobacco and Allied Stocks,* 143 F.Supp. at 323. Finally, the exercise of reasonable diligence must lead to discovery of facts indicating defendant's wrongful conduct or, as one court has

---

5. The common law claims start to run from the date plaintiffs knew or had reason to know by the exercise of reasonable diligence of the existence of their injury and that the injury was caused by another person's conduct. *See e.g., Urland, supra; Trice v. Mozenter,* 356 Pa.Super. 510, 515 A.2d 10 (1986).

6. Judge Leahy has explained the standard for inquiry notice as follows:
   What on the one hand is tantamount to an actual discovery of fraud should not be confused with what on the other carries a duty to investigate. It is impossible to lay down any general rule as to the amount of evidence or number of or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. *Tobacco and Allied Stocks,* 143 F.Supp. at 331.

stated, discovery of "such information, considering both its content and source, as would prompt a reasonably prudent person to undertake a lawsuit to enforce his or her claim." *Creamer v. General Teamsters Local Union 326*, 579 F.Supp. 1284, 1281 (D.Del.1984) (Stapleton, J.); *See also Mosesian, supra; Robertson, supra.*

Plaintiffs filed this action on October 29, 1986; therefore, the action is barred if their claims accrued before October 29, 1984. I conclude that, as a matter of law, plaintiffs should have known of sufficient storm warnings of errors in the audited financial statements prior to October 29, 1984, and thus they were on inquiry notice before that date. Moreover, in the exercise of reasonable diligence, a reasonable investor should have discovered the facts supporting plaintiffs' claims within two years after plaintiffs were on inquiry notice. My conclusion is based upon the relationship between plaintiffs and AIA, the circumstances surrounding AIA prior to October, 1984, and the fact that the primary thrust of the complaint alleges errors in the audited financial reports with respect to transactions between ITG and AIA of which plaintiffs should have been aware well before October 29, 1984, in light of available public information.

AIA made its initial public offering of its common stock on July 21, 1983, for $10 per share. In the prospectus accompanying the offering, AIA was described as predominantly a charter airline with an emphasis towards the casino gaming industry.[7] ITG was listed as one of four substantial charter customers of AIA and accounted for between 21 and 34 percent of its gaming charter revenues.

The prospectus also contained financial statements audited by Price Waterhouse for the seven months ending March 31, 1982, and the eight months ending November 30, 1982. The March, 1982, statement showed a loss from operations of $948,843

and a net loss of $1,403,741. For November, 1982, both losses were only $204,706. An unaudited report for the four months ending March 31, 1983, showed net income in excess of $718,000 and operating income of $371,378.

Subsequent to the public offering, AIA announced a shift from charter service to scheduled airline service. Thereafter, the company incurred extensive losses attributed to the business change. For the fourth quarter of 1983, the company incurred a loss of $13,399,000. For the fiscal quarter ending February 29, 1984, the company incurred a net loss of $5.2 million and had a working capital deficit of $13 million.

In April, 1984, ITG made several loans to AIA and a new contract was entered between ITG and AIA. On April 26, 1984, Roy Goldberg was made a director of AIA.

On May 10, 1984, AIA filed a registration statement and prospectus for a private rights offering of stock and warrants which Roy Goldberg signed as a director. Pursuant to this offering, ITG and Roy Goldberg converted outstanding loan balances in excess of $1 million to equity. The prospectus included audited financial statements for the year ended November 30, 1983, for which Price Waterhouse gave an unqualified opinion.[8]

In May, 1984, several class actions were filed against AIA, its officers and directors, and the underwriters of the public offering. The primary charge was that defendants fraudulently failed to disclose AIA's business transformation to a scheduled airline service in connection with the public offering. The complaints also made generalized allegations that the financial statements were fraudulent.

In July, 1984, a press release announced that K.B. Equities had purchased 40 percent of AIA's stock for $1 million. K.B. Equities paid 18½ cents per share at a time when the stock was trading at $1.25 per

---

**7.** AIA was a holding company for several subsidiaries of which American International Airways, Inc., was the principal operating subsidiary. For convenience, "AIA", as used in this opinion, included the parent company and its subsidiaries.

**8.** The prospectus also included the audited reports for March 31, 1982 and November 30, 1982.

share. On July 23 and 19, 1984, respectively, AIA and its principal operating subsidiary filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. On August 28, 1984, Roy Goldberg resigned as a director of AIA upon the advice of counsel.

On September 18, 1984, a published report, read by Roy Goldberg, disclosed that AIA allegedly had defrauded aircraft lessees by stripping parts from leased aircraft. At his deposition, Roy Goldberg testified that in July or August of 1984, Arthur Toll, chairman and chief executive officer of AIA, "tried to give me two engines to go hock to loan the company money." On September 19, 1984, it was reported that AIA had suspended all of its operations. An article the following day reported that an attorney for an AIA creditor reported to the bankruptcy judge that AIA's law firm had information of fraud by AIA or individuals at AIA. A trustee was thereafter appointed for the company. On October 21, 1984, the trustee moved for the appointment of an accounting firm.

An examination of the complaint and some of the alleged defects in the audits by Price Waterhouse reveals that plaintiffs, or a reasonable investor in their position, should have been on inquiry notice of accounting errors well before October 29, 1984. Plaintiffs allege that "trade accounts receivable" and "other accounts receivable" were substantially inflated in the November 30, 1982, statements thus portraying an improving financial condition for AIA. A portion of the alleged overstatement was caused by the inclusion of penalties due from ITG for flights cancelled before November 30, 1982. Plaintiffs contend, however, that ITG was not obligated to pay penalties to AIA and Price Waterhouse was reckless for not discovering this agreement. While the financial statements did not specifically list penalties as receivables from ITG, plaintiffs should have been on notice of their erroneous inclusion since note 2 stated that generally a charter party is liable for penalties up to 100 percent of the contracted price for cancellations within sixty days. In light of the substantial share of charter revenues attributed to ITG and the exclusive charter agency agreement between AIA and ITG, plaintiffs should have known that it was either an error not to disclose their non-penalty arrangement or that Price Waterhouse was not aware of it.

Plaintiffs also allege that "other accounts receivable" as of November 30, 1982, were overstated by $160,000 representing a loan from AIA to ITG which had never been made. This loan, however, was expressly listed in the prospectus accompanying the May, 1984, private rights offering, on the page immediately following Roy Goldberg's signature, on a schedule for amounts receivable from related parties. While the parties disagree over a director's obligation to review the accuracy of matters contained in a prospectus and the extent to which a director can rely on an independent accountant, it is quite clear that a reasonable investor, who is both a director and substantial customer of the offerer, purchasing over $1 million worth of equity pursuant to the offering, has a duty to *read* the prospectus and where a non-existent loan for $160,000 is listed be on notice that something is wrong. This duty is further heightened given the sharp decline in AIA's fortunes as of May, 1984.

Plaintiffs also allege that from February, 1983, through June, 1983, ITG made a number of short-term loans totalling $1,754,982.57 to AIA which AIA credited to accounts receivable. Four of the loans, totalling $1 million, were repaid within ten days of each loan and all the remaining loans were repaid in July, 1983. Once again, however, the inescapable conclusion is that plaintiffs should have been on inquiry notice of this error. The July 21, 1983, prospectus, the 10–Q reports, and the May, 1984, prospectus each include sections listing transactions between AIA and ITG.[9] These sections list a variety of loan and stock transactions with ITG; however, there is no reference to these short term

---

**9.** Note 17 to the financial statements in the July 21, 1983 prospectus also lists notable events subsequent to the November 30, 1982, and before May 27, 1983.

loans totalling over $1.7 million, a portion of which were still outstanding after preparation of the prospectus. In light of their aggregate, it is not reasonable to assume, without further inquiry, that these loans, while not disclosed, were nevertheless properly accounted for in the financial statements.

Finally, the notes to the financial statements in the May, 1984, prospectus stated that sales to ITG for the year ended November 30, 1983, were $13,912,000. In their complaint, plaintiffs allege that revenues for AIA were overstated by the use of false invoices purportedly from ITG in excess of $2.5 million, or almost 20 percent of the listed sales to ITG. Again, it is inconceivable that a reasonable person in plaintiffs' shoes would not verify this figure and find such a large discrepancy, particularly in light of the plight of AIA and ITG's large stake in AIA. I find plaintiffs' claim that they could not check this figure because ITG was on a different fiscal year to border on the frivolous. Surely, an accountant, in a very short time, could calculate billings to AIA for December 1, 1982, to November 30, 1983, from ITG's records.

It is clear that had plaintiffs examined the prospectus and the financial statements prepared for AIA by Price Waterhouse, even minimally, they would have been placed on inquiry notice of errors signalling a duty to exercise reasonable diligence. The duty to examine these public statements was heightened because of plaintiffs' significant business relations and their substantial investment position in AIA. Their position, coupled with the rapid decline of AIA and the allegations of fraud at AIA, would have put reasonable investors on notice to examine transactions that were questionable on their face and which could be disproved through an examination of their own records.

Because plaintiffs were on inquiry notice prior to October 29, 1984, their claims are barred if through the exercise of reasonable diligence they should have discovered the factual basis for their claims within the limitations period. It is clear, however, that in any event plaintiffs knew of the basis for their claims within two years. In May, 1985, the trustee demanded payment of over $600,000 shown as due from ITG on AIA's books. In September, 1985, plaintiffs were aware that an officer of AIA testified to fraudulent transactions by AIA including a phony $2.2 million purchase of airplane engines which were listed as assets by AIA. This money was then used to balance a reduction in receivables, including those of ITG. They also knew, in September, 1985, that a former AIA employee, then working for ITG, claimed to have prepared false AIA invoices to ITG in excess of $2.5 million. In November, 1985, Roy Goldberg testified that the trustee advised him that ITG accounts receivables had been overstated. In June, 1986, Roy Goldberg examined the confirmations from ITG used by Price Waterhouse in preparing its audits and testified they were forgeries. Finally on July 3, 1986, a class action complaint was filed against Price Waterhouse raising the same allegations as here.[10]

The parties have directed my attention to additional information of which plaintiffs were not aware and argue as to whether a reasonable investor would have discovered this information. I need not reach this issue. Even assuming plaintiffs exercised reasonable diligence, plaintiff actually knew of the basis of their claims against Price Waterhouse within two years after they were on inquiry notice based upon the facts listed above which plaintiffs concede they knew. For these reasons, I will enter judgment in favor of defendant on both the federal and the state claims as this knowledge clearly satisfies both standards of accrual, which are virtually identical. It is important to remember plaintiffs were not normal investors; rather, they wore several hats with respect to AIA: substantial

---

10. Moreover, additional information was discovered during this time period in the class actions. *See Gruber v. Price Waterhouse*, 697 F.Supp. 859, (E.D.Pa.1988). While plaintiffs dispute that this information was available to them, they have made no showing that they made any attempt to discover this information or otherwise exercised reasonable diligence to ferret out their claims.

customer, exclusive agent, major investor, and director. Moreover, they persisted in providing additional financial and business help to AIA well after it faced imminent death. I find it incredulous for plaintiffs, given their interests, to assert blind reliance on the financial statements audited by Price Waterhouse when the most basic examination of the prospectus and cross-check with ITG's own records would have disclosed substantial inconsistencies. As one court has stated, to permit an investor to sit idly by:

> would permit the securities acts to be used as havens for speculation and a buffer against any investment loss. When faced with knowledge of a company's serious financial difficulty, an investor cannot be allowed to wait for market increases knowing that if growth does not take place the securities acts will provide the insurance against loss. Instead, the exercise of reasonable diligence requires an investor to be reasonably cognizant of financial developments relating to his investment, and *mandates that early steps be taken to appraise those facts which come to the investor's attention.*

*Cook v. Avien,* 573 F.2d at 698 (emphasis added). Plaintiffs by either ignoring clear signals or failing to give even a cursory examination to public information, failed to satisfy this duty requiring me to conclude that their claims are barred.

### ORDER

AND NOW, this 7th day of September, 1988, upon consideration of the motions by plaintiffs and defendant for summary judgment, it is hereby ordered as follows:

1. Defendant's motion for summary judgment is granted.

2. Plaintiffs' motion for summary judgment is denied.

3. Judgment is entered in favor of defendant and against plaintiffs.