Harry BEGIER, Jr., Trustee in Bankruptcy of AIA Industries Inc. and American International Airways, Inc.

v.

PRICE WATERHOUSE.

Civ. A. No. 87–6096.

United States District Court,
E.D. Pennsylvania.

Dec. 23, 1991.

---

Michael H. Kaliner, Jackson & Sullivan, Fairless Hills, Pa., David S. Fishbone, Ciardi, Fishbone & Di Donato, Philadelphia, Pa., for plaintiff.

Patricia L. Freeland, Pepper, Hamilton & Scheetz, John G. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

I return again to the saga of AIA Industries, Inc. *In re AIA Industries, Inc. Securities Litigation,* Master File No. 84–2276 (E.D.Pa.). In this chapter, Harry Begier, AIA's trustee in bankruptcy, seeks to recover damages for negligence and breach of contract from Price Waterhouse ("PW"), AIA's accounting firm.[1] Mr. Begier alleges PW's insufficient audits of AIA's financial statements failed to disclose improper transactions and faulty internal accounting mechanisms. Mr. Begier claims AIA's reliance on these reports caused the company to sustain losses.

PW now seeks summary judgment on counts I (negligence) and II (breach of contract) under Fed.R.Civ.P. 56. Having considered the parties' briefs and oral argument, I will grant the motion on the negligence claim, but I will deny it on the contract claim.

## I. BACKGROUND

In 1981, Gayle Moneyhan and Arthur Toll created AIA Industries, Inc. and its wholly owned subsidiary, American International Airways, Inc., to provide charter airline service to casinos in Atlantic City, New Jersey. Nine people exerted the lion's share of control at AIA:

1. Arthur Toll was a director, chief executive officer, chairman of the board, and a member of the executive committee.

2. Gayle Moneyhan was vice chairman of the board, executive vice president, and a member of the executive committee.

3. Russell Stephenson was a director, president, chief operating officer, and a member of the executive committee.

4. Bruce Edmondson was senior vice president and chief financial officer.

5. George Phelan was vice president and treasurer.

6. Alan Marmon was a director, vice president, secretary, and general corporate counsel.

7. Howard Boros was a director and outside counsel.

8. George Bell was a director and a member of the AIA audit committee.

9. Roy Goldberg was a director.

In addition to their management positions, Messrs. Toll, Moneyhan, Marmon, Bell, and Goldberg each owned or controlled a substantial block of AIA's stock.

From the outset, PW provided audits of AIA's consolidated financial statements. Under this arrangement, PW produced financial reports for the seven months ending March 31, 1982, the eight months ending November 30, 1982, and the period ending November 30, 1983.

Initially, AIA raised capital through private stock placements, but on July 21, 1983, the firm orchestrated an initial public offering of $20 million in common stock. Immediately after raising this capital, AIA rapidly expanded and became the fourth largest scheduled carrier flying out of Philadelphia. The expansion proved unsuccessful. In July 1984, after large losses, and amid accusations of nefarious dealings, AIA filed for reorganization under Chapter 11 of the Bankruptcy Code.

As bankruptcy trustee, Mr. Begier claims PW inadequately performed its accounting responsibilities to AIA. Mr. Begier charges PW's financial investigations were

---

1. Plaintiff's complaint originally contained three more claims: one for all of the creditors who failed to file in Bankruptcy Court (count III), and two claims under the Securities and Exchange Act of 1934 (counts IV and V). On December 14, 1987, I dismissed these claims because the plaintiffs failed to state a claim upon which relief could be granted.

not in accordance with generally accepted accounting standards and the resulting statements did not comply with generally accepted accounting principles. Mr. Begier further alleges PW failed to disclose numerous, material facts, and as a result inaccurately portrayed the corporation's financial health. Mr. Begier also claims PW knew about the public offering and knew AIA and potential investors would rely on PW's information in connection with the public offering.

Based upon these allegations, Mr. Begier makes a breach of contract claim. In addition, he contends AIA relied on PW's negligently produced and inaccurate reports, allowed the initial public offering to go forward, and began a chain of events leading to large losses and ultimately, bankruptcy.

PW moved for summary judgment. On the negligence claim, PW argues Mr. Begier cannot establish cause in fact because AIA knew the PW reports were inaccurate. PW asserts two bases for knowledge: First, PW charges AIA's management was actually orchestrating all of the transactions at issue in this matter. Under the circumstances, then, even if PW's materials did not reveal any of the transactions, AIA still had knowledge of each and every deal.

Second, PW prepared a memorandum which outlined the problems in AIA's internal accounting systems. PW contends this report identified each accounting problem that AIA claims PW failed to disclose, and PW argues AIA's management read the report. Also, PW claims if AIA implemented all of the report's recommendations, AIA would have uncovered all of the other allegedly undisclosed, improper transactions.

PW also makes a proximate cause argument. PW contends AIA's management ran the business so poorly that bankruptcy was inevitable. As a result, PW urges that even if there was a breach and negligence, there is no way to connect the tort to the losses: damages are simply too speculative to prove and award.

2. I will not reach PW's proximate cause argument because PW's cause in fact argument dis-

## II. ANALYSIS

### A. Some Legal Principles.

The parties generally agree on the applicable law. First, as trustee, Mr. Begier stands in the debtor-corporation's shoes. Mr. Begier has the same rights as AIA, see *In re Gebco Investment Corp.*, 641 F.2d 143, 146 (3d Cir.1981), and any defenses applicable against the corporation apply to him. *See id.*

Second, there is no dispute concerning the elements of a negligence claim. Mr. Begier must show PW had a duty, breached it, the breach caused a harm, and finally, Mr. Begier must prove his damages. Third, the parties agree that when a corporation's officers acquire knowledge while acting within the scope of their employment, the knowledge is imputed to the corporation. *See Workmen's Compensation Appeals Board v. Evening Bulletin*, 498 Pa. 219, 445 A.2d 1190, 1192 (1982).

Fourth, because any negligence here concerns a misrepresentation, Mr. Begier must show any reliance by AIA on PW's statements was justified. *See Love v. Metropolitan Life Insurance Co.*, 99 F.Supp. 641 (E.D.Pa.1951).

These principles guide me to a simple inquiry: Can PW prove AIA's officers knew or should have known before the initial public offering, July 21, 1983, that PW's financial reports misrepresented AIA's financial health? If there was knowledge, there cannot be causation in fact and there can be no liability as a matter of law.[2]

Finally, because this is a motion for summary judgment, I must view all of the facts in a light most favorable to Mr. Begier. At the same time, I must grant summary judgment if, based on the uncontested record, no reasonable fact finder could hold against PW.

poses of this matter.

## B. The Facts.

### 1. The Specific Charges.

■ Mr. Begier claims PW failed to disclose material facts in seven principal areas:

*i. Internal Accounting Controls.* AIA's internal accounting controls were deficient.

*ii. ITG and Roy Goldberg Matters.*[3] ITG and AIA made several arrangements to make AIA's financial circumstances appear stronger than reality.

a. ITG made short term loans to AIA and created various other credit arrangements to hide AIA's financial difficulties.

b. Arthur Toll and Bruce Edmondson prepared false ITG invoices in 1983.

c. Toll and Edmondson orchestrated false pay-downs of ITG receivables in 1983.

*iii. Other False Invoices and Paydowns.* AIA prepared false invoices and paydown arrangements with Carefree David and First Tours.

*iv. The Phony Aircraft Engines Purchase.* Mr. Edmondson and Mr. Toll arranged for false purchases of four aircraft engines and used the funds to pay off false charges.

*v. Fraudulent Payments.* AIA made fraudulent payments to various people and organizations from March, 1983, to September, 1984.

*vi. Fraudulent Payments to Steven Homick.*[4] PW failed to disclose $37,768 in payments made to Steven Homick after November 30, 1982. These funds were described as payments for professional services and consulting fees, but Mr. Homick did not perform the work.

*vii. Overvalued Inventory.* AIA overvalued various leases for aircraft and spare parts.

In each case, the overwhelming and uncontested evidence allows only one conclusion: AIA's top managers had actual or, at the very least, constructive knowledge of each of these incidents before the public offering.

### 2. The Basis for Knowledge.

#### a. The Internal Accounting Controls.

Before June 22, 1983, PW prepared a report based upon its March 31, 1982, and November 30, 1982, audits and sent it to AIA's board of directors. The parties often refer to this three part document as the "management letter," but the actual title was "Recommendations Designed to Improve Internal Accounting Controls, Business Operations, and Tax Planning." Part I concerned "Recommendations which Management [Had] Implemented or [Was] in the Process of Implementing," and the second part concerned "Recommendations Which Management [Had] Not Yet Implemented." Part III concerned tax advice.

In his answers to interrogatory 17, the trustee alleged PW failed to disclose the following deficiencies in AIA's internal accounting control:

i. Certain employees could override the entire accounting system;

ii. There was no segregation of duties regarding access to bank accounts, receipts, and disbursements;

iii. The failure to apply cash receipts and wire transfers against specific invoices;

iv. The failure to maintain sufficient support for cash receipts and cash disbursements;

v. The failure to support cash disbursements with invoices or signed check requests including a description of the disbursement sufficient to enable a reviewer to approve or disapprove the transaction and determine if the disbursement and its recording were appropriate;

vi. The failure to approve account procedures relating to transactions with

---

**3.** ITG, Inc. was an air charter services broker. It was a major creditor of AIA, and ultimately became AIA's exclusive charter agent. Roy Goldberg was the sole shareholder, officer, and director of ITG, and as mentioned above, he was an AIA director.

**4.** Steven Homick was Gayle Moneyhan's friend, and Moneyhan introduced him to Arthur Toll. Toll and Moneyhan became friends, and as a result of the relationship, Homick worked on AIA renovation projects at the Atlantic City Airport and other AIA facilities.

ITG, including the need to maintain adequate documentation of agreements, the need to reconcile outstanding balances due from ITG, and the need to make periodic analyses of the transactions with ITG;

vii. The failure to reconcile key subsidiary accounts to the general ledger control accounts on a general basis;

viii. The failure to implement a complete revenue accounting system for generating revenue receivables, and air traffic liability balances;

ix. The failure to standardize procedures for the closing of the books of account;

x. The failure to maintain and reconcile a charter revenue receivable subsidiary ledger with the general ledger control account;

xi. The failure to age accounts receivable and review them to assess whether they could be collected;

xii. The failure to review closely costs accumulated and the Construction–In–Progress account and to determine the propriety of the disbursement or classification as a capital asset;

xiii. The failure to maintain detailed records and supporting documentation for the balances accumulated in the Construction–In–Progress account, including balances arising from self-construction projects;

xiv. The failure to establish a comprehensive operating budget;

xv. The failure to prepare and maintain an accounting procedures manual.

xvi. The failure to maintain a complete file of significant corporate documents;

xvii. The lack of segregation of duties;

xviii. The lack of accountability.

Even a cursory look indicates PW identified each of these problems in the internal costs accounting memorandum.[5] In fact, in many cases PW and the trustee have used the same words to describe the alleged omissions. On the internal accounting issue, then, the only question left is whether AIA knew about the document, and the undisputed evidence in the record leaves no doubt AIA did or should have known before the offering.

On June 27, 1983, PW sent thirteen copies of this report to Arthur Toll. *See* Ex. 30. In addition, Bell, Marmon, and Boros all testified to seeing this report, *see* Ex. 31 (Boros), 32 (Marmon), 33 (Bell), and Bell reported the Board of Directors discussed many if not all of the recommendations at their meetings. *See* Ex. 31. Moreover, Boros testified he spoke about the report with Toll, Bell, Marmon, Edmondson, and Stephenson. *See* Ex. 33.

In addition to this testimony, the trustee has made at least one damning admission. In response to interrogatory 69 served on November 14, 1984, he wrote: "The directors were advised by Price Waterhouse in a management letter issued to them in June, 1983, of the need to implement material financial control, yet all the directors

5. PW provided an exhibit at oral argument that dramatically demonstrates this point. For the purposes of this opinion and in the interest of brevity, I will simply identify the sections of PW's report that addressed each of Mr. Begier's contentions.

| Alleged Material Weakness | Appears in PW Recommendation |
| --- | --- |
| i. | Part I: 1 a, c, and Part II 5 a |
| ii. | Part I: 1 a, c, and Part II 5 a |
| iii. | Part I: 1 a, c, and Part II 5 a |
| iv. | Part I: 1 b |
| v. | Part II: 1 a |
| vi. | Part II: 1 b |
| vii. | Part II: 7 |
| viii. | Part I: 4 |
| ix. | Part I: 1 |
| x. | Part I: 2 |
| xi. | Part II: 1 a |
| xii. | Part II: 1 b |

and Edmondson failed to do so." Ex. 135, pg. 11. *See also id.* at 7.

AIA's response to the report also clearly shows the corporation knew about the internal controls letter and fully understood its contents. First, AIA formed an audit committee shortly after receiving the letter. PW recommended this move.[6] Second, in the original draft of AIA's Underwriting Agreement for the initial public offering, the corporation warranted its accounting was in accordance with generally accepted accounting principles and an accurate representation of AIA's financial health. *See* Ex. 43, pg. A-7.[7] In the final underwriting agreement, AIA dropped this warranty. *See* Ex. 43, pg. 47331-3.

As PW contended in its reply brief and at oral argument, the deletion of this warranty by itself precludes the negligence claim. PW's report clearly communicated that AIA's financial control systems were severely deficient, and the testimony demonstrates AIA knew about the report. By dropping the report, AIA revealed it received PW's message. Yet, instead of stopping the offering because the financial information was unreliable, AIA simply deleted the warranty.

This behavior clearly demonstrates AIA was not relying on PW with respect to the initial public offering. AIA could have used PW's advice to fix the financial reporting problems before the offering. AIA could have delayed the offering and used the time to implement PW's recommendations and get its internal control mechanisms in order. AIA could have even stopped the offering entirely in light of the accounting mess PW described. AIA did none of these things. Instead, AIA simply deleted its promise to provide accurate financial reporting.

Nevertheless, even if the internal accounting report was not a smoking gun, the record shows AIA knew about every other situation it claims PW failed to report. Furthermore, the record shows if AIA's managers had followed the recommendations in the internal accounting memorandum, they would have uncovered each of the remaining six alleged omissions.

b. *The ITG Transactions.*

ITG was a major customer, shareholder, and creditor of AIA. Mr. Begier alleges PW negligently failed to discover and disclose various dealings between AIA and ITG. All of the transactions were intended to create the appearance that AIA was financially healthy.

For instance, starting in February, 1983, ITG provided AIA with a steady stream of short term loans. AIA needed this money because it had lost approximately $8.2 million it raised through private financing. AIA used the ITG loans to fund its negative cash flow and to meet its payroll obligations. By July 21, 1983, AIA owed ITG $1,205,000.00. *See* Ex. 135, pg. 40.

AIA furthered the appearance of a healthy business by adding a number of false invoices to its books. These entries described flights that never happened and reflected services never performed. Other false entries inflated the amount of services rendered. Once again, the undisputed facts reveal AIA knew of these transactions before the public offering on July 21, 1983. *See* Ex. 136, pg. 15.

PW presents a number of admissions from interrogatory answers filed in related

---

**6.** Recommendation 6 reads: "The parent company should consider establishing an Audit Committee of the Board of Directors to assist the directors in fulfilling their responsibilities relative to financial matters." Ex. 30, pg. 5. In the summer of 1983, AIA formed an audit committee. Mr. Bell was the chairman and Mr. Boros was a member.

**7.** This warranty read: "the Company and its subsidiaries have maintained their respective books of account in accordance with generally accepted accounting principles consistently ap-

plied in all material respects and such books and records are and, during the period covered by the financial statements included in the Registration Statement and the Prospectus were, correct and complete in all material respects, fairly and accurately reflect or reflected the income, expenses, assets, and liabilities of the Company and its subsidiaries, as the case may be, and provide or provided a fair and materially accurate basis for the preparation of such financial statements;" Ex. 43, pg. A-7.

cases.[8] This uncontradicted testimony indicates Mr. Toll and Mr. Edmondson conceived and orchestrated the transactions between AIA and ITG. These statements also show Messrs. Moneyhan, Stephenson, Bell, Boros, and Marmon should have known about the AIA–ITG transactions, *see* Ex. 136, pg. 40, and that in certain cases Messrs. Bell, Boros, and Marmon negligently kept AIA's financial records in a way that allowed the transactions to occur and continue. *See* Ex. 135, pg. 7.

The admissions further show Mr. Phelan knew at least about certain false paydowns, most notably the airline engine transactions. *See* Ex. 61, pg. 91. Here, AIA faked purchasing two airplane engines for over $2 million. AIA sent the purchase money to Bennet Waites Aviation, secretly leased other engines, recovered the money from Bennet Waites, and used the funds to pay off ITG receivables. *Id.*

In addition, the admissions reveal all of the directors knew about the contents of PW's internal control memorandum but failed to adopt the changes PW suggested. *See* Ex. 135, pg. 7, 11. The admissions also acknowledge that following this advice would have checked the illicit transactions between AIA and ITG. *See* Ex. 137, pg. 55. Finally, these admissions all relate to the period before the initial public offering.

With all of this information, there is also my holding in the related matter *ITG v. Price Waterhouse*, 697 F.Supp. 867 (E.D.Pa.1988). There, I concluded Mr. Goldberg knew of the short term loans between AIA and ITG, including a $160,000 loan in 1982.

Given these facts, I conclude a reasonable fact finder would have to decide AIA knew or should have known about the ITG transactions before July 21, 1983, the date of the initial public offering.

c. *The Remaining Allegations.*

As PW outlines in its brief, other admissions cover the remaining alleged omissions, and demonstrate AIA's knowledge of these points before July 21, 1983. First, there are the Homick payments. Steve Homick received money for professional and consulting services. In one instance, Mr. Homick received money as a commission for an airplane purchase. Another payment was for advice concerning renovations at the Pomona Airport in Atlantic City. Mr. Homick also received other checks from AIA without supporting invoices. *See* Ex. 137, pg. 19–20.

Mr. Begier admitted in the consolidated answers to the contention interrogatories that Messrs. Toll, Edmondson, Bell and Moneyhan should have known about $37,768 paid to Steve Homick after November 30, 1982. *See* Ex. 137, pg. 25–6. These same interrogatory answers contain excerpts from George Phelan's testimony in which he describes how Arthur Toll directed him to draft checks to Steve Homick. *See id.* at 23.

**8.** In its motion for summary judgment, PW relies heavily on admissions concerning ITG from interrogatory answers in related actions concerning AIA. In these interrogatory answers (to the March 25, 1986, inquiries, Ex. 136, and the contention interrogatories of Marmon, Stephenson, et al., Ex 137), the trustee specifically disavowed answers concerning ITG because of pending or anticipated litigation.

I will consider this testimony to be judicial admissions despite the trustee's disclaimer.

The trustee did not challenge the ITG assertions in his answer to the motion for summary judgment. Similarly, there is no objection to these admissions in the K.B. Equities brief that the trustee incorporated into his answer. Moreover, the trustee specifically addressed PW's use of judicial admissions, and he never mentioned his previous refusal to join in these answers.

Even if I did not consider the ITG information as judicial admissions, though, I could still consider it uncontested evidence in this motion for summary judgment. These admissions against interest by other parties are part of the AIA record. The defendant may use them to show the absence of material facts in dispute, and once they are part of the record for summary judgment, the plaintiff must dispute them. *See Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988) ("the party moving for summary judgment has the initial burden of identifying evidence which it believes demonstrates the absence of a genuine issue of material fact. However, where the non-moving party bears the burden of proof, it must by affidavits or by the depositions and admissions on file make a showing sufficient to establish the existence of every element essential to that party's case."). Since the plaintiff has not disputed this information, I may consider it.

Similarly, Mr. Begier's admissions demonstrate AIA's knowledge about the allegedly fraudulent payments made to different entities from March, 1983, to September, 1984. In his answer to interrogatory 13, Mr. Begier described how Bruce Edmondson or George Phelan sent at least two of these payments, and how Mr. Phelan, Mr. Toll, Mr. Edmondson, and Mr. Homick participated in making all of the payments, or at least had direct knowledge of them. *See* Ex. 138, pg. 51. Moreover, at least one of these payments went to Mr. Homick himself. *See id.*

The answers to the contention interrogatories also admit AIA knew about the phony engine transactions with the Bennet Waites Corporation through Mr. Marmon, Mr. Boros, Mr. Bell, and Mr. Stephenson. *See* Ex. 137, pg. 48–49. The same paragraph notes further that AIA would have uncovered these transactions if AIA's management followed PW's internal accounting controls recommendations. *See id.* In the same way, implementing PW's accounting recommendations would have stopped the overvaluation of various equipment and inventories. Mr. Begier conceded this point in the May 27, 1986, contention interrogatory responses. *See* Ex. 137, pg. 55.

#### d. *The Trustee's Response.*

Mr. Begier does not deny any of these facts. Instead, he argues PW's management letter and report should have indicated AIA's internal control problems were "material weaknesses." Mr. Begier contends if PW had used these magic words, AIA would have hit the brakes before the July 21, 1983, offering.

There is no doubt the term "material weakness" has important significance in the accounting world. At the same time, though, Mr. Begier's argument says too little too late. It is hard to imagine that AIA's directors, who were fully aware of AIA's machinations, would have suddenly stopped the initial public offering had these two words been added to the PW materials. The internal accounting memorandum illustrates why: AIA's managers, owners, and directors read the report, implemented some of the changes, and edited their public offer documentation to comport with the accounting concerns that PW's investigation raised. Despite this knowledge, however, they did not stop the offering. Therefore, I conclude the term "material weakness" would have done nothing to change their acts. I also hold no reasonable fact finder could conclude otherwise.

Even if I ignored AIA's response to the report, the record plainly shows AIA's management, directors, and owners were intimately acquainted with all of the fraud and illicit dealings that were occurring. It defies logic to say that the very men who, by their own admission, were perpetrating these activities did not know about them or would have been restrained by the words "material weakness."

#### 3. The Contract Claim.

In contrast to the abundant evidence supporting summary judgment on the negligence claim, the motion for summary judgment on the contract claim is not well developed. The record shows PW identified every allegedly undisclosed issue, but at this point, there is no way to determine whether PW fulfilled its promise to provide accounting services to AIA. At the very least, the record fails to describe the contract's exact terms. I will therefore deny the motion for summary judgment on the contract claim.

### III. CONCLUSION

I conclude PW's June, 1983, report identified every internal accounting weakness that AIA claims PW failed to disclose. I also find AIA knew or should have known about all of the information in the June 1983 report before July 21, 1983, and despite PW's warnings continued with its plans for the public offering. In addition, I conclude that before July 21, 1983, AIA knew about each of the six other situations it accuses PW of failing to disclose.

Based on these findings, I must conclude that even if PW negligently prepared AIA's accounting materials, no reasonable fact finder could decide PW caused AIA's losses. It follows, then, AIA is unable to

**230**

establish cause in fact, and their negligence claim fails as a matter of law.

Because the defendant has not met its burden on the contract claim, though, I will deny the motion for summary judgment there.

An order follows.

### ORDER

AND NOW, this 23rd day of December, 1991, it is hereby ordered that:

1. Price Waterhouse's motion for summary judgment is granted in part and denied in part.

2. Summary judgment is entered in favor of Price Waterhouse against Harry Begier on Count I.

3. Summary judgment is denied on Count II.

4. A conference is scheduled for January 14, 1992, at 10:00 AM, to determine a schedule for any further discovery and trial.