**In re JACK GREENBERG, INC., Debtor.**

**Larry WASLOW, Trustee for Jack Greenberg, Inc., Plaintiff,**

v.

**GRANT THORNTON L.L.P., Defendant.**

**Bankruptcy No. 95–13891DWS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 6, 1997.

Walter Weir, Weir & Partners, Philadelphia, PA, for Trustee.

Arlene Fickler, Hoyle, Morris & Kerr, Philadelphia, PA, for Grant Thornton, L.L.P.

Joseph Minni, Philadelphia, PA, U.S. Trustee.

## OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is Defendant Grant Thornton's Motion to Dismiss Counts I–V of the Complaint (the "Motion"). Grant Thornton, a public accounting firm, provided accounting and auditing services to the Debtor, Jack Greenberg, Inc. ("Debtor"), from 1986 through 1994. During these years, Fred Greenberg ("Fred"), one of the Debtor's principals, engaged in a course of conduct with regard to the Debtor's business that resulted in an artificial inflation of the Debtor's gross profit. The Complaint contends that Fred's fraudulent conduct went undetected because Grant Thornton failed to properly perform its auditing services. Counts I through V of the Complaint contain various state law claims based on this theory.

Pursuant to Fed.R.Civ.P. 12(b)(6),[1] Grant Thornton seeks the dismissal of Counts I through V contending that: (i) the Chapter 7 Trustee (the "Trustee") cannot bring these claims on the Debtor's behalf because the Debtor would have been barred from asserting them outside of bankruptcy; and (ii) the Trustee lacks standing to bring the claims on behalf of the Debtor's creditors. In addition,

---

1. Rule 12(b)(6) is made applicable hereto by Fed. R.Bankr.P. 7012.

Grant Thornton seeks the dismissal of Counts III and V on the ground that the Trustee has failed to comply with the pleading requirements of Fed.R.Civ.P. 9(b).[2] For the reasons stated below, I deny the Motion insofar as it seeks the dismissal of Counts II and IV, but grant it with respect to Counts I, III and V. Because Counts III and V are dismissed for failure to satisfy the pleading requirements of Rule 9(b), I will grant the Trustee the opportunity to file an amended pleading for these counts.

## BACKGROUND

The Debtor is a corporation whose business was the wholesale and retail sale of domestic and foreign meat and cheese products. Complaint ¶ 3. The President and Vice President of the Debtor were Emanuel Greenberg ("Emanuel") and Fred, respectively, *id.* at ¶ 6.

On May 19, 1995, an involuntary petition requesting an Order for Relief under Chapter 7 of the Bankruptcy Code was filed against the Debtor by certain of its creditors. Complaint ¶ 2. On June 21, 1995, an Order for Relief was entered and the case was voluntarily converted by the Debtor to a case under Chapter 11. *Id.* Approximately one month later, on July 25, 1995, the case was reconverted to a case under Chapter 7. *Id.* Shortly thereafter, the Trustee was elected; his election was confirmed by Order dated September 1, 1995. *Id.*

On February 5, 1997, the Trustee commenced this adversary proceeding against Grant Thornton by filing a complaint ("Complaint") containing eight counts. The Motion focuses only on Counts I through V. These counts are: Count I—Breach of Contract; Count II—Negligence; Count III—Fraud; Count IV—Negligent Misrepresentation; and Count V—Aiding and Abetting. The facts which follow are gleaned from the allegations in the Complaint.[3]

From 1986 through 1994, Fred "singularly implemented and wholly managed the purchase and resale of imported frozen meat (the "Goods") for the Debtor." *Id.* at ¶ 10. He was responsible for the purchase and shipment of the Goods as well as maintenance of the inventory. *Id.* He also "maintained the books and financial records" for this part of the business. *Id.* According to the Trustee, "[n]o other officer, shareholder, or manager of the Debtor was involved in this aspect of the Debtor's business." *Id.*

The procedure which the Debtor utilized in purchasing the Goods for resale is explained

---

**2.** Rule 9(b) is made applicable hereto by Fed. R.Bankr.P. 7009.

**3.** Grant Thornton requests the Court, in ruling on its Motion, to take judicial notice of some additional facts not alleged in the Complaint, contending that these facts are "not subject to reasonable dispute." As support for these facts, Grant Thornton has attached to its Motion excerpts of testimony from a hearing on July 18, 1995 and a deposition of Fred Greenberg taken on July 25, 1995, both of which occurred in conjunction with the Debtor's bankruptcy case. Notably, the hearing on July 18 and the deposition on July 25 took place before the Debtor's bankruptcy case had been reconverted to Chapter 7 and the Trustee had been elected. Consequently, the Trustee did not participate in the proceedings. Moreover, I note that some of the additional facts urged upon me by Grant Thornton are not directly supported by the proffered testimony. For example, Grant Thornton states that "Fred Greenberg controlled fifty percent of the shares of stock of the Debtor; Emanuel Greenberg, Fred's brother, controlled the other fifty percent of those shares." Defendant's Brief in Support of Motion to Dismiss Counts I–V of the Complaint ("Defendant's Brief") at 4. How-

ever, the proffered testimony establishes only that Fred and his family own fifty percent of the stock and Emanuel and his family own the other fifty percent. *See* Exhibit B to Defendant's Brief at 84–85. No mention is made of either of the brothers "controlling" the stock or any portion thereof. In addition, while Grant Thornton asserts that "Fred and Emanuel were the two directors of the company," Defendant's Brief at 4, Fred's testimony suggests that his mother may have also been a director, *see* Exhibit C to Defendant's Brief at 17. Accordingly, I conclude that in ruling on the Motion it would be improper for me to take judicial notice of the additional facts which Grant Thornton suggests. *See* Fed.R.Evid. 201. Moreover, I decline to treat Grant Thornton's Motion as a motion for summary judgment. *See Brennan v. National Telephone Directory Corporation*, 850 F.Supp. 331, 335 (E.D.Pa.1994) (where a party attaches materials outside the pleadings to a motion to dismiss, it is within the court's discretion to treat the motion as a motion for summary judgment). I do not believe the material attached to Grant Thornton's Motion is "likely to facilitate the disposition of the action." Wright & Miller, Federal Practice and Procedure: Civil 2d § 1366. Therefore, I will not consider it in deciding the Motion.

in paragraphs 11 and 12 of the Complaint.[4] What is significant about this procedure is that Debtor prepaid for the Goods. *Id.* at ¶ 11. This practice enabled Fred to engage "in a course of conduct whereby he intentionally inflated the Debtor's gross profit by failing accurately to record the receipt of pre-paid inventory." *Id.* at ¶ 13. According to the Trustee, Fred did this "without the knowledge of, or the authorization of the Debtor," and "in his own self-interest and for his own personal gain." *Id.* By failing to properly account for the receipt of Goods, Fred "was able to systematically inflate the amount of pre-paid inventory, decrease the cost of goods sold and artificially inflate the profitability of the Debtor." *Id.* at ¶ 14. According to the Complaint, "[i]n so doing, [Fred] was able to tout the success of his business venture and management skills to the Debtor and the Debtor's creditors." *Id.* at ¶ 15.

In or about 1986 and for each year thereafter through 1995, the Debtor and Grant Thornton entered into a written agreement in which the Debtor engaged Grant Thornton to "prepare its financial statements and perform yearly audits of these financial statements." *Id.* at ¶ 19. Grant Thornton "warranted and agreed to prepare its audits in 'accordance with generally accepted auditing standards' ("GAAS")" which, according to the Trustee, obligated Grant Thornton to examine "on a test basis, evidence supporting the amounts and disclosures in the financial statements," to assess "the accounting principles used and significant estimates made by management," and to evaluate "the overall financial statement presentation." *Id.* at ¶ 21. However, according to the Trustee, Grant Thornton failed to fulfill these obligations. As a result, Fred "was able to continue his fraudulent conduct undetected, thereby causing the Debtor to overextend itself and be forced into bankruptcy by its creditors." *Id.* at ¶ 27. With respect to

Grant Thornton's conduct, the Trustee specifically alleges that it:

(a) failed to familiarize itself with the Debtor's business such that [Grant Thornton] failed to prepare and perform a proper audit program on behalf of the Debtor;

(b) failed to obtain [a] sufficient understanding of the Debtor's system of internal controls, or lack thereof;

(c) failed to adequately investigate and determine that the pre-paid inventory account was materially overstated and that significant amounts of the Goods listed therein had already been delivered, sold or taken into inventory;

(d) failed to verify or correlate the Debtor's actual inventory with reported inventory;

(e) grossly overstated the Debtor's profits for the years 1990 through 1993 and grossly understated the Debtor's losses for the same years;

(f) failed to obtain sufficient competent evidentiary material with respect to the Goods, including documentation prepared by independent third-parties;

(g) failed to make necessary inquiries in accordance with reasonable professional standards to discover what was readily discoverable, including the matters referred to herein, in order to protect the Debtor;

(h) rendered unqualified opinions despite the absence of internal controls of the Debtor and the lack of competent evidential matter with regard to the Goods;

(i) failed properly and adequately to inquire into the time of transfer to title of the Goods such that the inventory account could be properly and accurately stated and audited;

(j) created adjusting journal entries which concealed the Debtor's default under the terms of [its banks'] lending covenants;

---

4. These paragraphs of the Complaint state:

11. The Debtor, through the efforts of [Fred], received advance orders from the Debtor' customers, and only thereafter placed orders for the purchase and delivery of the Goods from overseas. It was customary for the Debtor to pre-pay for the Goods under the direction of [Fred].

12. The Goods were shipped C.I.F. from the seller to domestic ports where they were inspected by United States Customs, released to the Debtor and then inspected by an agent for the United States Department of Agriculture (USDA) at the Debtor's facility.

Complaint ¶¶ 11–12.

(k) failed to disclose that the Debtor was in default under the terms of [its banks'] lending covenants;

(l) failed to correct prior financial statements even after discovering that the statements did not properly reflect the financial condition of the Debtor at that time;

(m) failed to report and investigate suspicious financial entries which were obvious, or should have been obvious to it, but were not reported in the audit reports or not investigated; and .

(n) filed or caused to be filed with the Internal Revenue Service documents which it knew or should have known were not accurate.

26. [Grant Thornton] misrepresented and failed to disclose numerous material facts in the Debtor's financial statements it prepared for the years 1986 through 1994, as set forth above.

*Id.* at ¶¶ 25–26.

In 1994, Grant Thornton apparently discovered certain irregularities in Debtor's financial statements which, presumably, were due to Fred's failure to accurately record "the receipt of pre-paid inventory." *Id.* at ¶ 28. Grant Thornton advised Debtor of its discovery and declined to express an opinion on those statements. *Id.* The Trustee alleges that, as a result of Grant Thornton's wrongdoing as outlined above, Debtor suffered damages in the "nature of lost profits and resulting debt in an amount in excess of $3,000,000." *Id.* at ¶¶ 32, 36, 43, 48, 52.

In the Motion, Grant Thornton contends that the Trustee cannot assert the claims in Counts I through V on the Debtor's behalf because it could not have brought the claims outside of bankruptcy. Grant Thornton further argues that if I accept its contention that the Trustee cannot legally assert the claims set forth in Counts I through V on the Debtor's behalf, then these Counts must be dismissed because the Trustee has no standing to assert these claims on behalf of the creditors. Lastly, Grant Thornton contends that Counts III and V, for fraud and aiding and abetting fraud, respectively, must be dismissed because they fail to allege fraud with particularity.

## DISCUSSION

### I. Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) is the "proper means by which a defendant challenges the legal sufficiency of a complaint." *Sterling v. Southeastern Pennsylvania Transportation Authority,* 897 F.Supp. 893, 895 (E.D.Pa.1995). In ruling upon such a motion, the Court is required to accept as true all facts alleged by plaintiff in the complaint as well as any reasonable inferences that can be drawn from those facts after construing them in the light most favorable to the non-movant. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). A complaint is properly dismissed only if it "is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). *See also Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988) (dismissal is not appropriate unless it appears that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief). It is the burden of the moving party to show the legal insufficiency of the claims asserted. *Aetna Casualty and Surety Company v. Deitrich,* 803 F.Supp. 1032, 1034 (M.D.Pa. 1992) *(citing Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980)). In considering Grant Thornton's Motion, I apply this standard of review.

### II. The Legal Underpinnings of Grant Thornton's Argument That Counts I through V of the Complaint Fail to State a Claim Upon Which Relief Can Be Granted

It is helpful to view Grant Thornton's argument that Counts I through V must be dismissed for failure to state a claim upon which relief can be granted against the backdrop of the following principles of bankruptcy law. Pursuant to § 541, the trustee succeeds to the property of a debtor's estate which includes all causes of action the debtor could have brought outside of bankruptcy. *See* 11 U.S.C. § 541. *See also Hutzelman v. Farmers Home Administration (In re North East Projects, Inc.),* 133 B.R. 59, 60 (Bankr.

W.D.Pa.1991) (trustee succeeds to causes of action that "the bankrupt could have instituted had it not petitioned for bankruptcy"); *Pereira v. Centel Corporation (In re Argo Communications Corporation)*, 134 B.R. 776, 783 (Bankr.S.D.N.Y.1991) (it is a hornbook rule of law that "a bankruptcy trustee obtains rights of action belonging to the debtor"). *See also* Collier on Bankruptcy ¶ 541.10 at 541–46 (Lawrence P. King ed. 15th ed. 1996) ("The estate created pursuant to section 541(a) includes causes of action belonging to the debtor at the time the case is commenced"). Because of this, the trustee has standing to assert causes of action that the debtor could have asserted outside of bankruptcy. *Schertz–Cibolo–Universal City Independent School District v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir.1994). However, when the trustee brings a cause of action as successor to the debtor's interest under § 541, he is subject to the same defenses that could have been asserted by the defendant had the action been instituted by the debtor. *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989). *See also Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir.1996).

■ In contrast, the trustee has no standing generally to sue third parties on behalf of the creditors of the estate. The Supreme Court established this rule in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). *See also Schertz–Cibolo–Universal City Independent School District v. Wright (In re Educators Group Health Trust)*, *supra*, 25 F.3d

at 1284 (*citing Caplin* for proposition that "[i]f ... a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action."); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (*citing Caplin*) ("It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself.").

Based on these principles, Grant Thornton seeks the dismissal of Counts I through V asserting the following four-prong argument: (1) the Debtor could not have brought the claims set forth in Counts I through V outside of bankruptcy; (2) as such, the Trustee cannot bring the claims on the Debtor's behalf since he is subject to the same limitations and defenses as the Debtor would be outside of bankruptcy;[5] (3) therefore, "in actuality, the Trustee's action is one in the nature of a suit against Grant Thornton on behalf of the Debtor's creditors[.]" Defendant's Brief at 7; and (4) since the Trustee lacks standing to bring such suits, Counts I through V must be dismissed.

### III. Grant Thornton's Contention that the Debtor Could Not Proceed With Counts I through V Outside of Bankruptcy

Grant Thornton raises the following arguments to support its contention that the Trustee's action is barred because the Debtor could not bring the claims set forth in Counts I through V outside of bankruptcy:

(A) Counts I through V fail to state a claim upon which relief can be granted

---

5. Grant Thornton also argues that it is obvious from the allegations in the Complaint that the Trustee is, in actuality, bringing the claims asserted in Counts I through V on behalf of the estate's creditors rather than the Debtor because, under the facts pled, the creditors are the only parties who suffered any injury. This argument lacks merit. The Complaint alleges that, as a result of Grant Thornton's wrongdoing, Debtor suffered damages in the nature of "lost profits." The estate's creditors have no standing to bring suit to recover for Debtor's lost profits. Furthermore, the Complaint can also be viewed as alleging that, as a result of Grant Thornton's wrongdoing, Debtor exceeded its borrowing limits under the loan agreements which it had with its lenders, putting it in default of such agreements and thereby, allowing its creditors to force it into bankruptcy. Viewed in this manner, the Complaint alleges a harm to Debtor that is separate and apart from the harm suffered by its creditors. Whether such harm is compensable is a separate issue. I also note that, under Pennsylvania law, the estate's creditors may be barred from bringing a professional negligence action against Grant Thornton based on the lack of privity. *See Giant Eagle of Delaware, Inc. v. Coopers & Lybrand (Phar–Mor, Inc. Securities Litigation)*, 892 F.Supp. 676, 690 (W.D.Pa.1995) (holding that, under Pennsylvania law, "a plaintiff cannot maintain an action for professional negligence in the absence of privity with the defendant").

because reliance is an element of these claims and under the law of imputation, as set forth in *Rochez Bros., Inc., v. Rhoades,* 527 F.2d 880 (3d Cir.1975), *cert. denied,* 425 U.S. 993 [96 S.Ct. 2205, 48 L.Ed.2d 817] (1976), Fred's knowledge and misconduct must be imputed to the Debtor; [6]

(B) Counts I, II and IV are barred by the rule enunciated in *Jewelcor Jewelers and Distributors, Inc. v. Corr,* 373 Pa.Super. 536, 550–553, 542 A.2d 72, 79–80 (1988), *appeal denied,* [524 Pa. 608] 569 A.2d 1367 (1989), that a company that interferes with performance of an audit cannot sue the auditor where the company's conduct is a substantial factor in its loss; and

(C) Count I fails to state a claim because there is no cause of action for breach of contract based upon an auditor's failure to perform its services with professional standards.

Based on the limited record before me, I find that Grant Thornton has not established that there is no set of facts that can be proven to preclude the application of the imputation doctrine or otherwise allow the claims of the Trustee sounding in tort. However, I am persuaded by the last argument and conclude that Count I fails to state a claim for breach of contract.

## A. The Law of Imputation

### (1)

■ The parties do not dispute that reliance is a necessary element of the Trustee's

tort claim against Grant Thornton. Grant Thornton, however, contends that the Debtor could not have relied upon the audit statements which it prepared because, under the law of imputation, Fred's conduct and knowledge must be imputed to the company. [7] In support of this contention, Grant Thornton cites to *Rochez Bros., Inc. v. Rhoades, supra,* wherein the Third Circuit stated the following general principles of agency law:

> There is no doubt that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation. This is true even if the officer's conduct was unauthorized, effected for his own benefit but clothed with apparent authority of the corporation, or contrary to instructions. The underlying reason is that a corporation can speak and act only through its agents and so must be accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business.

*Id.* at 884 (*citing* 10 Fletcher, Cyclopedia Corporations § 4886 at 298 & 299 (rev. ed.1970)). Notably, *Rochez* was decided before *O'Melveny & Myers v, Federal Deposit Insurance Corporation,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), which held that the issue of imputation is determined by state law. While the Third Circuit did not rely upon Pennsylvania case law for its summary of agency law, the principles which the Third Circuit espoused are consistent with

---

**6.** Presented as a separate argument but in effect a variant of the first is Grant Thornton's contention that Counts I through V of the Complaint are barred by the rule established in *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), that "a corporation in which the top management has engaged in a fraudulent scheme directed against outsiders cannot later sue its auditors on grounds that the auditors failed to discover the scheme," Defendant's Brief at 6. As discussed below, *Cenco* and *Rochez* are applicable only when the fraudulent conduct benefits the corporation.

**7.** The Trustee asserts that the "question of whether the actions and knowledge of [Fred] are imputed to the Debtor is one properly raised as

an affirmative defense to the Trustee's claims and as an affirmative defense, imputation should not be considered by the Court in connection with a motion to dismiss." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Plaintiff's Brief") at 16–17. However, this assertion fails to account for the well-established rule that a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense appears on its face and presents an "insuperable barrier to recovery by the plaintiff." *See Flight Systems, Inc. v. Electronic Data Systems Corporation,* 112 F.3d 124, 127 (3d Cir. 1997) (*citing Continental Collieries v. Shober,* 130 F.2d 631, 635–636 (3d Cir.1942)). *See also ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir. 1994).

Pennsylvania agency law,[8] succinctly stated by the Pennsylvania Supreme Court long ago in *National Bank of Shamokin v. Waynesboro Knitting Co.*, 314 Pa. 365, 371, 172 A. 131, 134 (1934) (*quoting Gunster v. Scranton Illuminating, Heat & Power Co.*, 181 Pa. 327, 337–338, 37 A. 550, 552 (1897)):

> The rule that knowledge or notice on the part of the agent is to be treated as notice to the principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But the legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. But no agent who is acting in his own antagonistic interest, or who is about to commit a fraud by which his principal will be affected, does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature.

Accordingly, I will apply the test for imputation stated in *Rochez*.

■ Neither party in its brief addresses the legal standard for determining whether Fred was acting within the "course of his employment" when he committed his fraudulent acts.[9] I note that under Pennsylvania law, the test for whether an individual's conduct occurred within the "scope of employment" depends upon whether the conduct meets the following three criteria: (1) it must be of the kind the actor was employed to perform; (2) it must have occurred substantially within the authorized time and space limits; and (3) it must have been actuated, at least in part, by a purpose to serve the employer. *Shuman Estate v. Weber*, 276 Pa.Super. 209, 216, 419 A.2d 169, 173 (1980). Since the third prong of this test requires a finding that the actions were intended to serve the employer, it would appear to overlap the *Rochez* imputation test, which requires a benefit to the corporation. Because, as discussed below, I find that Grant Thornton has failed to prove on the record of this motion that Fred's fraudulent conduct has benefitted the Debtor, it has not established every element of the course of employment test without regard to whether Fred's acts were authorized or not.

### (2)

Grant Thornton argues that because Fred's misconduct enabled the Debtor to "continue to obtain credit from its lenders and trade creditors for several years," Defendant's Brief at 11, the Debtor benefitted from his fraud. The issue is more complex than this. Rather the record before me which consists only of the allegations in the Complaint, when viewed in the light most favorable to the Trustee as they must be on a motion to dismiss, suggests that Fred's conduct was not "for the benefit of the corporation." If so, then the adverse interest exception to the imputation doctrine would apply. *See Resolution Trust Corporation v. Farmer*, 865 F.Supp. 1143, 1155–1156 (E.D.Pa.1994) (noting that Pennsylvania agency law provides that "knowledge of an agent whose interests are adverse to the principal cannot be imputed to the principal"); *Todd v. Skelly*, 384 Pa. 423, 429, 120 A.2d 906, 909 (1956) (*citing* 10 Fletcher, Corporations, § 4877, at 345) ("Where an agent acts in his own interest which is antagonistic to that of his principal, or commits a fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority or employment, the principal who has received no benefit therefrom will not be liable for the agent's

---

**8.** I note the parties' apparent agreement that Pennsylvania law is applicable here.

**9.** Grant Thornton asserts that since paragraph 10 of the Complaint alleges that Fred was solely responsible for the "purchase and shipment of the Goods, as well as for the maintenance of the inventory" and that he "maintained the books and financial records in connection with the importation and sale of the Goods," when he engaged in his "course of conduct whereby he intentionally inflated the Debtor's gross profit by failing to record the receipt of pre-paid inventory," he was acting within the course of his employment. *See* Reply Brief in Support of Motion of Defendant Grant Thornton to Dismiss Counts I–V of the Complaint ("Defendant's Reply Brief") at 10–11. Significantly, Grant Thornton failed to cite controlling Pennsylvania authority for determining when acts are within the course of employment. The Trustee, while denying that Fred was acting within the course of his employment, likewise offers no legal support for his view.

tortious act."); *Solomon v. Gibson*, 419 Pa.Super. 284, 615 A.2d 367 (1992) (" 'a principal is liable to innocent third parties for the frauds ... of his agent committed in the course of his employment, although his principal did not authorize, justify or participate in, or indeed know of such misconduct' .... [except] where the 'agent acts in his own interest which is antagonistic to that of his principal, or commits a fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority or employment' ").

According to the Complaint, as a result of Fred's fraudulent conduct (and the combined wrongdoing of Grant Thornton), the Debtor was unaware of its true financial situation and, because of this, borrowed an amount from its lenders in excess of that allowed under it loan agreements, causing it to be in default under those agreements. Complaint ¶ 40. The borrowing of funds, when such act puts the company in default of its loan agreements, cannot be viewed as a benefit to the company, either short or long term.[10] Furthermore, according to the Complaint, Fred committed his fraudulent acts with the subjective intent of benefitting himself.[11] *See* Complaint ¶ 15 (alleging that Fred engaged in his fraudulent course of conduct so that he could "tout the success of his business venture and management skills to the Debtor and to the Debtor's creditors."). As the adverse interest exception may be established, I cannot on this record sustain Grant Thornton's position that imputation of Fred's knowledge to the Debtor is appropriate. *See Phar–Mor, Inc. v. Coopers & Lybrand*, 900 F.Supp. 784, 786–787 (W.D.Pa.1995) (court could not conclude, as a matter of law, that the fraudulent acts of Phar–Mor's officers and employees were intended to benefit the company since, although the wrongdoers testified that the motivation behind their fraud was to provide time for management to resolve the company's underlying business problems, "a reasonable trier of fact could conclude that the true motive of the wrongdoers was the preservation of their employment, salaries, emoluments and reputations, as well as their liberty, at the expense of the company's corporate well-being."); *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 242 (S.D.N.Y.1987) (concluding that determination of whether company benefitted from management's fraud could not be determined as a matter of law on motion to dismiss).

### (3)

■ This is, however, not the end of the analysis for there is an exception to the adverse interest exception which both parties

---

10. There is a dispute in the case law on whether to evaluate the benefit to a company based on the short term or long term effect of its agent's fraud. *Compare Seidman & Seidman v. Gee*, 625 So.2d 1, 3 (Fla.Dist.Ct.App.1992) (in determining whether company benefitted from agent's fraudulent misrepresentation that it was backed by a $10 million dollar certificate of deposit, court focused on short-term benefit of misrepresentation which was that the company was able to obtain a license to conduct business rather than long-term result which was that the misrepresentation led to the company's financial demise), *review granted* 640 So.2d 1106 (Fla.1994), *cause dismissed* 653 So.2d 384 (Fla.1995), *with Bloor v. Dansker (In re Investors Funding Corporation)*, 523 F.Supp. 533, 541 (S.D.N.Y.1980) (rejecting notion that fraud benefitted company by creating an artificial financial picture that enabled it to obtain huge quantities of funds from creditors and investors and thereby to continue in operations past its point of actual insolvency, reasoning that "a corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial to it.") and

*McHale v. Huff (In re Huff)*, 109 B.R. 506, 512 (Bankr.S.D.Fla.1989) ("A corporation is damaged where its officers and directors fraudulently conceal its insolvency and allow the corporation to continue incurring more and more debt and become more and more insolvent."). In any event, when a company borrows money that puts it in default of its loan agreements, it would seem extremely short-sighted to view its receipt of the borrowed money as a benefit.

I do note that since Fred's misconduct continued from 1986 through 1994, it could be argued that the Debtor benefitted from his misconduct during some of the years. However, it is impossible to make this determination based solely on the allegations in the Complaint.

11. *See CEPA Consulting, LTD v. King Main Hurdman (In re Wedtech Securities Litigation)*, 138 B.R. 5, 9 (S.D.N.Y.1992) (recognizing that "benefit" to the company may be determined objectively, by evaluating whether the fraud increased the company's value, or subjectively, by ascertaining the motivation of the officers who committed the fraud).

acknowledge.[12] Under this exception, which is referred to as the "sole actor" or "sole representative" doctrine, *see* William M. Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 827, at 156 (perm. ed. rev. vol. 1994), if an agent is the sole actor or representative of the principal in the transaction to which notice is sought to be imputed, then that agent's wrongful conduct is imputable to the principal regardless of whether the agent's conduct was for the benefit of, or adverse to, the corporate interest. The rationale behind this doctrine has been expressed as:

Where a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to act without accountability.

*First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1417–1418 (7th Cir.1988), and as:

[W]here the officer in question is the sole representative of the corporation, there is no one to whom to impart his or her knowledge and no one from whom to conceal it.

William M. Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 827.10, at 160 (perm. ed. rev. vol. 1994).

The sole actor doctrine appears to be recognized in Pennsylvania although it has never been applied in the context of a suit for audit malpractice. *See Gordon v. Continental Casualty Co.*, 319 Pa. 555, 181 A. 574 (1935) (where officer acted on behalf of the company in representing, in a written application for issuance of a bond to indemnify the company against loss due to employee dis-

honesty, that none of the company's officers were dishonest or unworthy of trust, and, at the time, he was embezzling the company, the officer's knowledge that he was dishonest was imputed to the company to prevent recovery against the defendant on the bond). *See also See National Bank of Shamokin v. Waynesboro Knitting Co.*, 314 Pa. 365, 172 A. 131 (1934) (court recognized the "sole actor" exception, but found it unnecessary to apply it).

In federal cases involving claims against auditors for failure to discover fraud, the "sole actor" doctrine has been applied where the agent who committed the misconduct was the sole shareholder of the corporation, *see Federal Deposit Insurance Corp. v. Ernst & Young*, 967 F.2d 166 (5th Cir.1992) (where fraudulent acts were committed by corporation's sole owner who dominated and controlled its board of directors, summary judgment was properly entered in favor of auditor on claim for negligence on ground that corporation did not rely upon the audit),[13] and where the wrongdoers were dual owners of the corporation and "in every relevant sense 'dominated' " it, *see PNC Bank, Kentucky, Inc. v. Housing Mortgage Corporation*, 899 F.Supp. 1399, 1403–1406 (W.D.Pa.1994) (granting motion to dismiss professional malpractice claims filed by company against its auditor on ground that company did not rely upon audits conducted by auditor since it was aware, through the knowledge of its dual owners and top officers, of fraudulent conduct affecting the accuracy of the financial statements). The doctrine was held inapplicable where the wrongdoers owned only 70% of the company's stock and their involvement in the company, while considerable, could not be char-

---

**12.** Grant Thornton did not mention the sole actor doctrine in its original brief; however, the Trustee raised the doctrine in its opposing brief, *see* Plaintiff's Brief at 18 n. 6, and Grant Thornton included an extensive discussion of the doctrine in its reply brief, *see* Defendant's Reply Brief at 12–16.

**13.** Grant Thornton also cites to *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir.1997), to support application of the sole actor doctrine. In this case, the Second Circuit stated: "[T]he adverse interest exception does not apply

to cases in which the principal is a corporation and the agent is its sole shareholder ... [W]here the principal and agent are one and the same, the adverse interest exception itself is subject to an exception styled the 'sole actor' rule. This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as the principal." *Id.* at 827 (citations omitted). The allegations in the Trustee's Complaint indicate that Fred is not the Debtor's sole shareholder.

acterized as "dominating." *See Comeau v. Rupp*, 810 F.Supp. 1127, 1141 n. 5 (D.Kan. 1992).

While the Complaint establishes that Fred was the sole actor with regard to that aspect of the business in which he committed his fraud, *i.e.*, that portion of the business involving the Goods, the allegations in the Complaint do not establish that he is the sole shareholder of the Debtor or that he dominated and controlled it. Indeed, although the allegations in the Complaint identify Fred as the Vice President of the Debtor, they do not reveal whether Fred was involved in any aspect of the business other than the Goods portion. For example, the Complaint does not indicate whether Fred was involved in the Debtor's dealings with Grant Thornton or in Debtor's decisions to borrow finds in reliance on Grant Thornton's audits. Moreover, as there is no allegation that Fred dominated or controlled Debtor, I cannot conclude that he was the "sole actor" with respect to preparation of the financial statements to foreclose reliance by the Debtor on Grant Thornton's audits. Accordingly, I find that I cannot apply the sole actor doctrine based on the allegations of the Complaint.

### (4)

█ Finally in support of its contention that knowledge of Fred's fraudulent activities can be imputed to the Debtor precluding reliance on the audit, Grant Thornton refers to the Seventh Circuit's *Cenco* decision. *See supra* at n. 6. In *Cenco*, the company's top managerial employees, including its chairman, president and other top managers, engaged in massive fraud aimed at inflating the company's inventories far above their actual value. As a result of the fraud, the market price of Cenco's stock greatly increased. In addition, the company was able to "borrow money at lower rates than if its inventories had been honestly stated." 686 F.2d at 451. The company further benefitted from the fraud because it recovered excess amounts from its insurers for lost or destroyed inventory based on the inflated values of the inventory. *Id.*

After its corrupt management was replaced, Cenco filed claims against its auditor for, *inter alia,* breach of contract, negligence and fraud, on the theory that it failed to prevent the fraud committed by Cenco's former management. *Id.* A jury trial was held and judgment was entered in favor of the auditors. *Id.* at 452.

On appeal, the Seventh Circuit addressed the issue of "in what circumstances, if any, [is] fraud by corporate employees [ ] a defense to a suit by the corporation against its auditors for failure to prevent the fraud." *Id.* at 454. Applying Illinois law to resolve this issue, the Seventh Circuit held that when the top management of a company engages in fraud intending to benefit the company, the employees' actions will be attributed to the company and, as such, will be a defense to a suit against the company's auditors for failure to prevent the fraud. *Id.* at 454–456. In reaching this decision, the Seventh Circuit was guided by the two objectives of tort liability which it identified as: (1) compensating victims of wrongdoing; and (2) deterring future wrongdoing. *Id.* at 455.

Analyzing the first stated objective, the Seventh Circuit reasoned that a judgment in favor of Cenco would "be perverse from the standpoint of compensating victims of wrongdoing" since the real beneficiaries of such a judgment would be Cenco's shareholders among which were the "corrupt officers themselves." *Id.* at 455. With regard to the issue of deterrence, the appellate court opined that while liability against Cenco's auditor would make it and firms like it more diligent in the future, allowing the owners of the corrupt company to shift the costs of its wrongdoing to its auditor would reduce their incentives to hire honest managers and monitor their behavior. *Id.* at 455–456. On this point, the Seventh Circuit reasoned as follows:

> [N]ot only were some of Cenco's owners dishonest but the honest owners, and their delegates—a board of directors on which dishonesty and carelessness were well represented—were slipshod in their oversight and so share responsibility for the fraud that [the auditor] failed to detect. In addition, the scale of the fraud—the number and high rank of the managers involved— both complicated the task of discovery for

Seidman and makes the failure of oversight by Cenco's shareholders and board of directors hard to condone.

*Id.* at 456. Thus, the Seventh Circuit concluded that the objectives of tort liability would be best served by preventing Cenco from shifting responsibility for its managers' fraud to its auditors.

Central to Seventh Circuit's decision in *Cenco* and its discussion regarding tort objectives was its assumption that Cenco's managers were acting for the benefit of the company. *Id.* at 456. The Seventh Circuit noted that:

> Furthermore, we must assume that Cenco's corrupt managers were acting for the benefit of the company and not against it.... The jury was instructed that it could attribute the fraud of Cenco's managers to Cenco only if it found that the managers had been acting on Cenco's behalf, and the verdict for [the auditor] implies that the jury either so found or found that [the auditor] had not even committed a prima facie breach of duty to Cenco. The former assumption is more favorable to Cenco.

*Id.* The Seventh Circuit contrasted situations in which fraud is committed on behalf of a company from situations in which fraud is committed against it:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore very strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud. Maybe not net beneficiaries after the fraud is unmasked and the corporation is sued—that is a question of damages, and is not before us. But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corpo-

ration, and the stockholders should not be allowed to escape all responsibility for such a fraud, as they are trying to do in this case.

*Id.* at 456.[14] Thus, the holding in *Cenco*, as the holding in *Rochez*, is limited to situations in which the fraud is intended to benefit the company rather than the individual employees at the company's expense.

One year after its decision in *Cenco*, the Seventh Circuit revisited the imputation issue in *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). In this case, the plaintiff was the Illinois Director of Insurance (the "Liquidator"), acting as the statutory liquidator for, Reserve Insurance Company ("Reserve"). The Liquidator sued Reserve's auditors for issuing unqualified financial statements when they knew that the company was insolvent. When the statements were issued, the company's officers and directors were engaged in fraud to keep the company in business. As a result of their fraud, the company became saddled with additional liabilities and was driven deeper into insolvency.

On appeal, the auditors argued that since the Liquidator was standing in the shoes of the company, he was estopped from proceeding against them under the ruling in *Cenco*. *Id.* at 1346–1349. The Seventh Circuit disagreed. In so holding, the Seventh Circuit reasoned that the *Cenco* analysis only applies to situations in which the company benefitted from its management's fraud:

> In *Cenco*, this court found that the fraudulent inflation of the corporation's inventories and hence stock prices clearly benefitted the corporation to the detriment of outside creditors, stock purchasers and insurers; this fact, in the court's view, made the case ripe for an analysis of whether the directors' knowledge of the fraud should be imputed to the benefitted corporation. By contrast, the complaint in the instant case alleges a far-reaching scheme in which, as

---

**14.** In the words of the Seventh Circuit, the result achieved in *Cenco* was intended to cover those situations in which "fraud permeates the top management of the company" and "managers are not stealing from the company—that is, from its current stockholders—but instead are turning the company into an engine of theft against outsiders—creditors, prospective stockholders, insurers, etc." *Id.* at 454.

a consequence of the illegal activities of Reserve's directors and the outside defendants, Reserve was, *inter alia*, fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated Reserve's insolvency. In no way can these results be described as beneficial to Reserve.

*Id.* at 1347–1348. The court further reasoned that, even if it applied the *Cenco* analysis, it would not result in the outcome which the auditors desired, namely "estoppel of the [Liquidator] based on the imputation to Reserve of the directors' knowledge of the fraud." *Id.* at 1348. The Seventh Circuit reached this conclusion by considering whether imputation to bar recovery by the Liquidator would further the tort objectives which it had identified in *Cenco*. It concluded that imputation was not warranted because recovery by the Liquidator on behalf of Reserve would serve the objectives of tort law. With regard to the objective of compensating the victims of wrongdoing, the Seventh Circuit stated:

> [A]ny recovery by the [Liquidator] from the instant suit will inure to Reserve's estate. And under the distribution provisions of the governing liquidation statute, it is the policyholders and creditors who have first claim (after administrative costs and wages owed) to the assets of the estate. Ill. Rev.Stat., ch. 73 § 817 (1981). Thus, the claims of these entirely innocent parties must be satisfied in full before Reserve's shareholders, last in line for recovery, receive anything.
>
> Moreover, there is no indication here that the [Liquidator's] success entails the likelihood of the kind of "perverse" compensation pattern which we declined to permit in *Cenco*. In *Cenco*, the court was troubled by the fact that among the shareholders benefitting from a successful recovery were the corrupt managers themselves ...; here, the defendants do not claim that the wrongdoing officers or directors hold equity positions.... We were also troubled in *Cenco* by the prospect of double recovery by the shareholders via the plaintiff corporation in view of

the previous successful recovery of damages by the same shareholders in a direct suit against the defendants. In this case, by contrast, the other actions noted to this court based on these alleged events have yet to result in recovery. Of course, if [the Liquidator] recovers successfully in the instant suit, the defendants in these actions will be able to assert the previous satisfaction of the claims of the shareholders, policyholders, and creditors of Reserve as a bar to subsequent recovery.

*Id.* at 1348–1349. Insofar as the objective of deterring further wrongdoing, the court explained that in *Cenco* its refusal to permit the company to recover was motivated by two factors: "(1) that the directors, as shareholders, would recover directly from the suit; and (2) that there existed large corporate shareholders in a position to police Cenco's corrupt officers, an activity which would be discouraged by allowing the shifting of corruption-caused loss to outside defendants." *Id.* at 1349. The Seventh Circuit reasoned that, in contrast, in the case currently before it, neither of those concerns was present. There was no evidence that the wrongdoing officers of Reserve would benefit directly from the Liquidator's suit or that Reserve had a large corporate shareholder that was capable of conducting an independent audit and "whose lack of investigatory zeal would be rewarded" by an award for the Liquidator. *Id.* The court further noted that "unlike the situation in *Cenco*, permitting recovery in this case would not send unqualified signals to shareholders that they need not be alert to managerial fraud since they may later recover full indemnification for that fraud from third party participants." *Id.* Thus, the Seventh Circuit concluded that even if *Cenco* was applicable, "application of its compensation and deterrent principles would not inhibit the right of the [Liquidator] to proceed against the defendants." *Id.*

The rationale of *Cenco* have been applied by a number of courts. *See e.g., In re Stat–Tech Securities Litigation,* 905 F.Supp. 1416, (D.Col.1995); *Phar–Mor, Inc. v. Coopers & Lybrand (In re Phar–Mor, Inc. Securities Litigation),* 900 F.Supp. 784 (W.D.Pa.1995);

*Seidman & Seidman v. Gee,* 625 So.2d 1 (Fla.Dist.Ct.App.1992).

In framing a construct for the application of the imputation doctrine to assertions of liability against accountants, auditors and other professionals, these cases have adapted the themes sounded in traditional imputation cases to a new setting. The imputation theory grew out of actions, most frequently brought by financial institutions, to recover on obligations that were created through the fraudulent acts of their agents.[15] Notably, in these cases, the plaintiff was seeking to recover from an innocent party. The policy reason for imputing the knowledge of the wrongdoer to the plaintiff employer was explained by the Pennsylvania Supreme Court:

> Where one of two *innocent* persons must suffer by the fraud or negligence of a third, whichever of the two has accredited him, ought to bear the loss.

*Gordon v. Continental Casualty, supra,* 319 Pa. at 565, 181 A. at 577 (emphasis added). Other courts emphasized this factor as well. In *Supreme Petroleum, supra,* the Court stated:

> Recourse to the qualification of the exception to the imputed knowledge rule [*i.e.,* the sole actor exception], as in the case of the general rule itself, remains subject to a showing of good faith by the third party seeking protection thereof.

199 Kan. at 676, 433 P.2d at 378 (*citing* 3 Am.Jur.2d *Agency* § 286 at 648). And as recognized by the Court in *Ash v. Georgia–Pacific Corp.,* 957 F.2d 432, 436 (7th Cir. 1992):

> [Cases] hold that as between the employer of a dishonest agent and a stranger (a customer or holder in due course), the employer bears the responsibility—for it, at least, could select and monitor the agent. Exposure to liability then induces the employer to take cost-justified precautions.

▉ The framework for an accountant liability case does not fit squarely into the well developed agency law concerning imputation as the plaintiff is not seeking to retain the benefit of the fraudulent transaction. Moreover, the allegations of a well-pleaded Complaint will never establish the accountant to be a stranger or innocent party. However, *Cenco* and its progeny make clear that accountants (or other professionals) can, in appropriate circumstances, be insulated from their own negligence when the agent of their client has acted fraudulently and his fraud has benefitted the company *and* such result will further the underlying objectives of tort liability, *i.e.,* to compensate victims and deter wrongdoing. Thus, it appears that what the *Cenco* line of cases adds to the jurisprudence is an express recognition, implicit in the earlier imputation cases, that the objectives of tort liability are to be the touchstone by which a court should consider the invocation of the doctrine.

---

**15.** As stated by the Pennsylvania Supreme Court in *Gordon v. Continental Casualty,* 319 Pa. 555, 560, 181 A. 574, 575 (1935):

> It is argued by appellant's counsel, and we think convincingly, that the adverse interest exception to the rule that knowledge of a corporate officer is knowledge of the corporation, applies only where a third person seeks to enforce some demand against the corporation( ... ), but the exception has no application where the corporation seeks to enforce the benefit of a fraud perpetrated by its officer on a third person; that the exception is not a vehicle for the consummation of fraud.

And, for example, in *First National Bank of Cicero v. United States of America,* 653 F.Supp. 1312, 1316 (N.D.Ill.), *reconsideration denied,* 664 F.Supp. 1169 (N.D.Ill.1987), *aff'd in part, vacated in part,* 860 F.2d 1407 (7th Cir.1988), the Court in explaining the "sole actor" exception stated:

> If a principal's claim to property rests on the acts of his agent, he cannot both retain the property and avoid the legal effect of the knowledge the agent had when he acquired it. Restatement of Agency, §§ 8C, 274 and comment a. The real question is not how many people contributed some small act towards the transaction, but whether the principal's interest in the property ultimately depends on the acts of the agent.

Likewise, in *Supreme Petroleum, Inc. v. Briggs,* 199 Kan. 669, 433 P.2d 373 (1967), the Kansas Supreme Court found summary judgment inappropriate where a factual question existed as to whether the officer endorsing a note was the sole actor or alter ego of the corporate holder. In so ruling, it set forth the applicable general agency principals, quoting from 3 Am.Jur.2d *Agency* § 284:

> [I]f the principal asserts or stands on the transaction, either affirmatively or defensively, or seeks to retain the benefit of the transaction, he is charged with the agent's knowledge.

199 Kan. at 676, 433 P.2d at 378.

As tort policy considerations are integral to a *Cenco* analysis, it is not surprising then that certain courts have recognized that when the beneficiaries of the recovery are creditors and not the shareholders who would in a solvent corporation benefit from the corporation's recovery,[16] a different result may be required. Thus, in *Stat–Tech Securities Litigation*, 905 F.Supp. 1416, 1422 (D.Colo.1995), the Court found the policy underpinnings of *Cenco* not served and stated:

> Where, as here, recovery from defendants would benefit the creditors of the estate, not the wrongdoers, the company is not barred from seeking damages against allegedly corrupt former officers and directors.

Likewise in *Tew v. Chase Manhattan Bank*, 728 F.Supp. 1551, 1560 (S.D.Fla.), *amended on reconsideration on other grounds*, 741 F.Supp. 220 (S.D.Fla.1990), the Court concluded that the rationales underlying *Cenco* were inapplicable since all of the wrongdoers had transferred their interest to the trustee and any recovery from the defendant would benefit the creditors of the estate and not the wrongdoers. In *Phar–Mor, Inc. v. Coopers & Lybrand (In re Phar–Mor, Inc. Securities) supra*, at 787, the Court found that objectives of tort liability would arguably be served if Phar–Mor ultimately prevailed on claims against the auditor since under the proposed plan of reorganization, the company's claims against its auditor would be "assigned to a litigation trust established by the plan, and any recovery by Phar–Mor ... would inure to the benefit of the secured and unsecured creditors having an interest in the trust" and not to the fraudulent actors or Phar–Mor's equity holders. In *Drabkin v. L & L Construction Associates, Inc. (In re Latin Investment Corporation)*, 168 B.R. 1, 6 (Bankr.D.C.1993), the Court reasoned that the policy concerns of *Cenco* were not present where shareholders did not benefit from their fraud since it rendered their ownership interest worthless and there was no possibility that shareholders would receive any distribution from the estate.

The Court in *Federal Deposit Insurance Corp. v. O'Melveny & Myers*, 61 F.3d 17, 18 (1995),[17] came to a similar result for a different reason. While recognizing the general rule that a receiver, like a bankruptcy trustee, occupies no better position than that which was occupied by the party for whom he acts, the Court found that defenses based on the party's unclean hands or inequitable conduct do not generally apply against a party's receiver. *See also Gordon v. Basroon (In re Plaza Mortgage and Finance Corp.*, 187 B.R. 37, 45–46 (Bankr.N.D.Ga. 1995)).[18]

On the limited record before me, I also cannot determine that the objectives of tort liability would be served by preventing the Trustee from seeking recovery against Grant Thornton in light of Fred's culpability.[19] *See Resolution Trust Corporation v. KPMG Peat Marwick*, 844 F.Supp. 431, 434 n. 2 (N.D.Ill. 1994) (*citing* to *Cenco* and concluding that defendant's "theory of imputation of the knowledge of Horizon's management to Horizon cannot be resolved on the face of the complaint"). Relevant questions remain unanswered such as whether the Debtor benefitted from Fred's fraud, *see* discussion above, and whether Fred or any of the other shareholders would benefit from the damages recovered by the Trustee if he ultimately prevailed on his claims. Consequently, I

---

**16.** This is not to state that the trustee is bringing the lawsuit on behalf of creditors. *See infra* at 9–11 & n. 5. Rather it recognizes that a corporation in liquidation will distribute its assets to creditors.

**17.** This decision followed remand from the United States Supreme Court which held that there is no federal common-law rule divesting the states of authority over the entire law of imputation. 512 U.S. at 84–85, 114 S.Ct. at 2053–2054.

**18.** The *Plaza Mortgage* Court did not answer the question it posed, *i.e.*, whether a trustee in bankruptcy collecting assets for the benefit of creditors can be held in *pari delecto* as to the wrongful acts of the entity in bankruptcy, as the parties had failed to brief the issue under applicable state law. Accordingly a briefing schedule was established. Similarly I have not had the benefit of the parties' views on this issue.

**19.** Neither Grant Thornton's original brief nor its reply brief discuss whether the objectives of tort liability would be served by allowing the Trustee to proceed with his claims.

cannot determine, as a matter of law, that the imputation doctrine would bar the Debtor from recovering against Grant Thornton.

### C. The Substantial Factor Rule

■ Grant Thornton contends that Counts I, II and IV should be dismissed because the allegations in the Complaint establish that Fred's conduct interfered with Grant Thornton's audits. In support of this contention, Grant Thornton cites to *Jewelcor Jewelers and Distributors, Inc. v. Corr, supra*. In this case, as here, an accounting firm was being sued for negligently performing an audit. The accounting firm contended that the company was contributorily negligent, presenting evidence that the company's internal inventory had been miscalculated by its employees and that the officer who discovered the miscalculations had failed to timely inform the auditors of the errors and arguing that such negligence prevented the accounting firm from properly performing its services. On appeal, the state appellate court approved the trial court's use of the following jury instruction:

> Contributory negligence of a Plaintiff is a defense only when it contributed to the Defendant's failure to perform its contract and report the truth. If you find that the Plaintiffs were contributorily negligent, then you must determine whether their conduct was a substantial factor in bringing about their loss. If you answer in the affirmative on both questions, that is, if you find that Plaintiffs were negligent and that their conduct was a substantial factor in causing their losses, your verdict must be for the Defendant on the negligence theory.

373 Pa.Super. at 551, 542 A.2d at 80. This instruction incorporates a two-part test. The first part is whether the plaintiff's conduct interfered with the audit and, the second, whether the interference was a substantial factor in causing the plaintiff's loss.[20] Notably, *Jewelcor Jewelers and Distributors, Inc. v. Corr* does not discuss the issue of imputation, there being no allegations of employee fraud. However, in applying the first part of the test where, as here, the company's negligence is based on employee fraud, the issue of imputation arises. If the employee's fraudulent conduct is not imputable to the company, then the issue of contributory negligence does not apply. As I discussed at length above, I cannot determine the issue of imputation on the limited record before me.

■ Furthermore, Grant Thornton ignores the second part of the substantial factor test. This part of the test is also fact-intensive and not susceptible to resolution at this stage of the proceeding. See *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp., supra*, at 1409–1410 (issue of audit interference involves numerous issues fact, including whether any contributory negligence was substantial enough to relieve auditor of liability, and may not be determined as a matter of law). Accordingly, I will not dismiss Counts I, II, and IV on this theory either.

### D. The Trustee's Breach of Contract Claim

■ Grant Thornton next contends that Count I of the Complaint should be dismissed because it fails to state a claim for breach of contract. I agree.

■ Under Pennsylvania law, a plaintiff can bring a professional malpractice claim in contract or tort. *Guy v. Liederbach*, 501 Pa. 47, 55, 459 A.2d 744, 748 (1983). However, when the claim is based on a profession-

---

**20.** Several years prior to *Jewelcor Jewelers and Distributors, Inc. v. Corr*, the Superior Court decided *Robert Wooler Company v. Fidelity Bank*, 330 Pa.Super. 523, 479 A.2d 1027 (1984). In this case, which also involved accounting malpractice, the accounting firm was sued on the theory that its negligent performance permitted the company's loss, caused by employee theft, to go undetected. Rather than using the substantial factor test to determine the issue of contributory negligence and focusing on whether the company's conduct was a substantial factor in causing its losses, the Superior Court utilized the substantial factor test to satisfy the element of proximate cause, holding that the accounting firm, which the trial court found had breached its duty of care, could be held liable in damages only "if its negligence was a substantial factor in bringing about [the company's] loss by employee defalcation." *Id.* at 535–536, 479 A.2d at 1033. When used in this manner, the substantial factor test ensures a causal connection between the accounting firm's conduct and the company's loss.

al's failure to exercise due care, "it will sound in contract only if [the professional] fail[ed] to follow the client's specific instructions or, by her negligence, breach[ed] a specific provision of the contract." *Edwards v. Thorpe,* 876 F.Supp. 693, 694 (E.D.Pa.1995) (specifically referring to attorney malpractice). *See also Hoyer v. Frazee,* 323 Pa.Super. 421, 425–426, 470 A.2d 990, 992–993 (1984). Allegations that the professional failed to perform her service with the requisite standard of care do not suffice to state a claim for breach of contract even if the professional expressly agreed to act in accordance with that level of care. *See Tuman v. Genesis Associates,* 894 F.Supp. 183, 186 (E.D.Pa. 1995) (where claim is based on defendant's failure to provide the plaintiff with acceptable professional services, plaintiff must allege that the defendant breached more than the non-contractually created duty of care to state a contract claim); *Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Company, P.C.,* 1992 WL 196768 at *5–6 (E.D.Pa. Aug. 10, 1992) (agreement to act with the legally required level of care does not constitute a specific contractual promise because it if did "claims in tort and claims in breach of contract, at least within the context of service contracts, would be indistinguishable"). *See also Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.,* 1997 WL 102521 at *5 (E.D.Pa. February 28, 1997) (claim that attorney violated the standard of care owed by an attorney did not constitute a claim for breach of contract).

Since Count I alleges only that Grant Thornton agreed to prepare its audits in accordance with generally accepted auditing standards and that it failed to do so,[21] Count I fails to state a breach of contract claim.[22]

*Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Company, P.C., supra,* at *5–7 (claim that accounting firm failed to comply with its contractual agreement to perform auditing services in accordance with GAAS failed to state claim for breach of contract). Since the Trustee alleges a separate claim for negligence against Grant Thornton, I will dismiss Count I.

### IV. Failure to Plead Fraud with Particularity

■■■ Grant Thornton also argues that Counts III and V fail to comply with the pleading requirements of Rule 9(b) because "[t]he Complaint does nothing more than recite a laundry list of alleged GAAP and GAAS violations, *see* Comp. ¶¶ 25(a)-(n), and state in conclusory fashion that Grant Thornton did so 'knowingly, wilfully and wantonly.'" Defendant's Brief at 35. Rule 9(b) states, in pertinent part:

> In all averments of fraud ..., the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). The purpose of this rule is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v, Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). In evaluating the Trustee's claims in the context of Rule 9(b), I am mindful of the Third Circuit's admonition that "focusing exclusively on [the rule's] particularity lan-

---

21. The Trustee asserts that Grant Thornton's agreement to "examine on a test basis, evidence supporting the figures set forth in the financial statements" constitutes a specific provision of the contract which Grant Thornton breached. However, as the allegations in the Complaint are pled, the agreement to examine evidence on a test basis was part of Grant Thornton's agreement to act in accordance with GAAS:

> [Grant Thornton] further warranted and agreed to prepare its audits in "accordance with generally accepted auditing standards" ("GAAS") *which included* [Grant Thornton's] examination "... on a test basis, [of] evidence

supporting the amounts and disclosures in the financial statements ... [.]"
Complaint ¶ 21 (emphasis added).

22. The trustee cites to *Begier v. Price Waterhouse,* 135 B.R. 222 (E.D.Pa.1991), to support his contention that Count I states a claim for breach of contract. However, in this decision, the court did not decide whether the plaintiffs allegations were sufficient to state a claim for breach of contract; that issue was not before it. *See id.* at 224 (identifying defendant's arguments on motion for summary judgment).

guage is too narrow an approach and fails to take into account the simplicity and flexibility contemplated by the rules." *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (*quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969)).

█ Based on my review of the Complaint, I conclude that the Trustee has failed to satisfy the particularity requirement of Rule 9(b).[23] While he has adequately recited the accounting principles which were allegedly violated, he refers to "suspicious financial entries" that Grant Thornton allegedly failed to report and investigate, "documents" that Grant Thornton knew or should have known were inaccurate, "numerous material facts in the Debtor's financial statements" that Grant Thornton misrepresented or failed to disclose and "financial statements" which Grant Thornton prepared that were "false and misleading," without providing any specific information regarding the same. *See* Complaint ¶¶ 25(*l*), 25(m), 25(n), 26, 45. In order to comply with the particularity language of Rule 9(b), the Trustee must insert some specificity into his pleading instead of these generalized references. *See Official Committee of Unsecured Creditors of Corell Steel v. Fishbein and Company, P.C., supra,* at *8 (particularity requirement of Rule 9(b) met where plaintiff identified the specific accounting and auditing standards allegedly violated and was "specific as to which financial statements [were allegedly false] and how those statements were fraudulent"); *In re U.S. Healthcare, Inc. Securities Litigation, supra,* 122 F.R.D. at 470 (plaintiffs satisfied Rule 9(b) where they identified the accounting and auditing standards that were allegedly not followed, "clearly identified the financial statements which they allege[d] were materially false" and "particularly identified the allegedly misleading portions of the documents"); *Pell v. Weinstein,* 759 F.Supp. 1107, 1118–1119 (M.D.Pa.1991) (plaintiffs failed to satisfy Rule 9(b) where they made no attempt to identify the errors in the financial statements or the amounts of any inaccuracies and failed to identify any specific

accounting or auditing standard which was violated), *aff'd,* 961 F.2d 1568 (3d Cir.1992). Since the Trustee may be able to cure the deficiencies in Counts III and V, I will grant him the opportunity to amend the Complaint with respect to these counts. *See* 2A Moore's Federal Practice ¶ 12.07[2–5], at 12–72 (2d ed.1991) (when a motion under Rule 12(b)(6) is granted, "ordinarily an opportunity to amend should be fully granted if the deficiencies in the complaint can be corrected by amendment").

## V.  Summary

Count I is dismissed for failure to state a claim. Counts III and IV are dismissed for failure to comply with the pleading requirement of Rule 9(b); however, the Trustee is granted leave to amend the Complaint within 20 days to cure this deficiency.

---

23. Since the standard for Rule 9(b) is different in the Second Circuit, *see In re U.S. Healthcare, Inc. Securities Litigation,* 122 F.R.D. 467, 470 (E.D.Pa.1988), Grant Thornton's references to Second Circuit case law are not helpful.